**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| Fresh Roof, LLC; Hawk Seale LLC; Herlan Industries LLC; MAAD Industries, LLC; Nacu Hernandez; and Austin Hohmann,<br><br>Plaintiffs,<br><br>v.<br><br>SoyLei Innovations, LLC,<br><br>Defendant. | Civil Action No.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Fresh Roof, LLC ("Fresh Roof"); Hawk Seale LLC ("Hawk Seale"); Herlan Industries LLC ("Herlan"); MAAD Industries, LLC ("MAAD"); Nacu Hernandez; and Austin Hohmann (collectively, "Plaintiffs"), for their Complaint against Defendant SoyLei Innovations, LLC ("SoyLei"), to the best of their knowledge, information, and belief, allege as follows:

**PRELIMINARY STATEMENT**

1. This is an action for a declaratory judgment of non-infringement of United States Patent No. 12,297,150 arising under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the patent laws of the United States, including Title 35, United States Code; unfair competition arising under 15 U.S.C. 1125 and the trademark laws of the United States, including Title 15, United States Code; defamation; copyright infringement arising under 17 U.S.C. § 501 and the copyright laws of the United States, including Title 17, United States Code; tortious interference with business or contractual

relations; declaratory judgment of no conversion; declaratory judgment of no breach of fiduciary duty; declaratory judgment against judicial expulsion; and declaratory judgment of no unfair competition.

2. Herlan (via Dr. Hernandez), MAAD (via Dr. Hohmann), Corkboard (via Mr. Cochran), and three others are currently members of SoyLei Innovations, LLC. Fresh Roof and Hawk Seale are former customers of SoyLei. SoyLei was a start-up company founded by researchers from Iowa State University with high hopes of commercial success. However, after SoyLei lost its federal funding and needed to cease its operations, Dr. Hernandez and Dr. Hohmann were directed to sell equipment and raw materials housed at a warehouse that SoyLei rented. They did so. With Mr. Cochran's approval, Hawk Seale purchased soybean-oil material that had not been emulsified along with emulsifying equipment, with the express understanding that Hawk Seale would use the equipment to emulsify the soybean-oil material.

3. For a host of reasons, SoyLei did not achieve the commercial success its founders anticipated and the business and personal relationships between the founders deteriorated. After a period of dormancy, SoyLei recently reinitiated business operations and has chosen to go after its members and former customers. It has asserted baseless patent infringement claims against Fresh Roof, Hawk Seale, Dr. Hernandez, and Dr. Hohmann. Mr. Cochran filed a meritless police report against Dr. Hernandez and Dr. Hohmann alleging that they "stole" property from SoyLei, when that property had been properly sold or disposed of at Mr. Cochran's explicit request. Undeterred, Mr. Cochran then filed a baseless complaint on SoyLei's behalf with the Iowa Attorney General's office

against Fresh Roof, and is now contacting Fresh Roof's customers and making unfounded accusations in an attempt to disrupt Fresh Roof's business and unfairly compete with it.

4. After SoyLei's attempts with the Ames Police Department and Iowa Attorney General's Office failed, SoyLei then filed a complaint in state court against Plaintiffs for (1) conversion (against Dr. Hernandez and Dr. Hohmann), (2) breach of fiduciary duty (against Dr. Hernandez and Dr. Hohmann), (3) judicial expulsion (against MAAD and Herlan), and (4) unfair competition (against Fresh Roof, Hawk Seale, Herlan, and MAAD). Plaintiffs bring this case to address causes of action exclusively within the province of the federal courts and to put an end to SoyLei's abuse of the legal system.[1]

## PARTIES

5. Plaintiff Fresh Roof, LLC is an Iowa limited-liability company with its principal place of business in Ames, Iowa.

6. Plaintiff Hawk Seale LLC is an Iowa limited-liability company with its principal place of business in Postville, Iowa.

7. Plaintiff Herlan Industries, LLC is an Iowa limited-liability company with its principal place of business in Ames, Iowa.

8. Plaintiff MAAD Industries, LLC is an Iowa limited-liability company with its principal place of business in West Des Moines, Iowa.

9. Plaintiff Nacu Hernandez is an individual residing in Ames, Iowa. Dr. Hernandez is a manager and member of Herlan.

[1] Plaintiffs intend to request that the state court stay the case pending resolution of the claims brought here.

10. Plaintiff Austin Hohmann is an individual residing in Ames, Iowa. Dr. Hohmann is a manager and member of MAAD.

11. Defendant SoyLei Innovations, LLC is an Iowa limited-liability company with its principal place of business in Ames, Iowa.

## JURISDICTION

12. This court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338, 2201, and 2202, and pursuant to the principles of supplemental jurisdiction under 28 U.S.C. § 1367(a).

13. This court has general and specific personal jurisdiction over Defendant because this suit arises out of and is related to Defendant's conduct in Iowa. Further, SoyLei's principal place of business is in Iowa and it is incorporated in Iowa. SoyLei maintains substantial, continuous, and systemic contacts with the state of Iowa through its business and operations in Iowa.

## VENUE

14. Venue is proper in this district under 28 U.S.C. §§ 1391(b), 1391(c), and 1400.

## FACTS

### *Relationship Between the Parties*

15. In 2020, SoyLei was organized under Iowa law as a manager-managed limited-liability company.

16. SoyLei has six members: Poly Bit Unlimited, LLC (operated by R.

Christopher Williams), Herlan (operated by Dr. Hernandez), MAAD (operated by Dr. Hohmann), Short Trees Industries, LLC (operated by Michael Forrester), 3BC, LLC (operated by Baker Kuehl), and Corkboard Innovations, LLC (operated by Eric Cochran).

17. SoyLei develops, sells, and licenses soybean-oil based chemical technologies such as additives and rejuvenators for asphalt pavement, concrete pavement protection, and asphalt shingles. Specifically, it developed a sub-epoxidized soybean oil ("SESO") for use in asphalt roof rejuvenation.

18. Currently and at all relevant times, Mr. Cochran has acted as a manager for SoyLei.

19. In approximately January 2025, SoyLei was informed that it would no longer receive federal grants. As a result, SoyLei was not financially able to continue its operations. Dr. Hernandez and Dr. Hohmann were furloughed and asked to continue working for SoyLei long enough to wrap up its operations. They still have not been compensated for that work.

20. Dr. Hernandez and Dr. Hohmann were employed by SoyLei and acted as officers for SoyLei until May 2025.

21. Mr. Cochran directed Dr. Hernandez and Dr. Hohmann to sell all of the contents of a warehouse that SoyLei was renting so that it could recuperate some funds and discontinue its monthly rental obligation. The contents included a variety of items, including emulsified SESO material, SESO material that had not been emulsified, emulsifying equipment, a forklift, asphalt testing equipment, desks, chairs, monitors, and other office equipment.

22. On or about January 30, 2025, Mr. Cochran asked Dr. Hernandez to look for a home for the SESO.

23. In a February 21, 2025 email, Mr. Cochran told Dr. Hernandez, "Obviously if you find a buyer for all that SESO, hurray." ***See*** **Exhibit 1**.

24. On February 11, 2025, SoyLei conducted its Biennial Meeting, where all members "[r]esolved, that all previous acts, conduct and transactions of the Members and Managers of the Company during the past year are hereby ratified, approved and confirmed and the same shall be granted all the authority necessary to continue operations into the future." ***See*** **Exhibit 2.**

25. The Operating Agreement of SoyLei authorizes judicial expulsion of a member when the member (1) engages in wrongful conduct that has or will adversely and materially affect SoyLei's activities; (2) willfully or persistently commits a material breach of the Operating Agreement; or (3) engages in conduct relating to SoyLei's activities which makes it not reasonably practicable to carry on the activities with the Member associated with SoyLei. ***See*** **Exhibit 3** § 7.01(c).

***Patent at Issue***

26. United States Patent Number 12,297,150 (the "'150 Patent") is entitled "Maintenance treatments useful for improving the performance of aged or brittle resinous binders in paving or roofing." ***See*** **Exhibit 4**.

27. The '150 Patent names, among others, Mr. Cochran, Dr. Hernandez, and Dr. Hohmann as inventors.

28. The '150 Patent was filed on October 12, 2021 and issued on May 13,

2025.

29. The ’150 Patent covers an emulsified asphalt product and an emulsified coating product, both of which contain one or more rejuvenators. One such rejuvenator is SESO.

30. The ’150 Patent lists the applicant and assignee as Iowa State University Research Foundation, Inc.

31. SoyLei has an exclusive license to the ’150 Patent.

***<u>SoyLei’s Sales to Fresh Roof and Hawk Seale</u>***

32. Pursuant to its patent license, SoyLei sold emulsions containing the rejuvenator SESO that supposedly improves performance of asphalt.

33. As employees of SoyLei, Dr. Hohmann and Dr. Hernandez sold SoyLei’s emulsions.

34. Through 2025, Hawk Seale and Fresh Roof were customers of SoyLei. In fact, Hawk Seale and Fresh Roof were SoyLei’s primary customers, consisting of approximately at least 90 percent of SoyLei’s sales.

35. Dr. Hernandez was an independent contractor for Hawk Seale starting in June 2025.

36. As an independent contractor for Hawk Seale, Dr. Hernandez sourced product and leased space for Hawk Seale.

37. Dr. Hernandez has never had a financial interest in Hawk Seale.

38. By 2024, Fresh Roof had an exclusive agreement with SoyLei to purchase SoyLei’s emulsions in bulk to supply to Fresh Roof’s dealer network.

39. In the spring of 2025, when Fresh Roof attempted to place a larger reorder of emulsion from SoyLei, SoyLei informed Fresh Roof that SoyLei was shutting down its operations.

40. In approximately March 2025, SoyLei sold SESO that had not been emulsified and emulsion equipment to Hawk Seale so that Hawk Seale could emulsify the SESO itself.

41. In a phone call on February 7, 2025 between Mr. Cochran and Dr. Hernandez, Mr. Cochran asked "How do you want to continue to service Matt and Kermit," referring to Matt Riesselman, Fresh Roof's representative, and Kermit Miller, Hawk Seale's representative.

42. Dr. Hernandez responded, "Well, I told them that they're going to have to do it themselves. So they're going to have to buy the equipment and we're just going to sell the raw materials to them."

43. Mr. Cochran approved of that plan on the call, and verified that the emulsion equipment would be adequate for Hawk Seale's needs.

44. In an email dated March 11, 2025, Mr. Cochran also approved of Dr. Hernandez's pricing of the emulsion equipment and SESO that had not been emulsified to sell to Hawk Seale. ***See*** **Exhibit 5**.

45. After a period of dormancy, SoyLei re-started business operations and wanted to get its former customers Fresh Roof and Hawk Seale back. On August 21, 2025, Mr. Cochran sent a text message to Dr. Hernandez asking Dr. Hernandez to reintroduce Mr. Cochran to representatives for Fresh Roof and Hawk Seale, stating "It is my strong

preference to reaffirm the SoyLei HawkSeale relationship... Likewise with Matt. I would much rather have him back as a customer." ***See*** **Exhibit 6.**

46. After SoyLei stopped producing emulsions, however, Fresh Roof transitioned to a different formula that does not include the emulsified SESO claimed in the '150 Patent.

***Existence of an Actual Controversy***

***SoyLei's March 13, 2026 Letters Alleging Patent Infringement***

47. By way of four letters, each dated March 13, 2026, Defendant SoyLei accused Plaintiffs Fresh Roof, Hawk Seale, Dr. Hohmann, and Dr. Hernandez of infringing the '150 Patent.

48. SoyLei's March 13 letter to Fresh Roof alleged that Fresh Roof is "selling products that directly infringe one or more claims of the '150 Patent (the 'Accused Products'). In particular, the Accused Products improperly incorporate a sub-epoxidized soybean oil in an emulsified coating product with a surfactant and water in violation of Claim 1 of the '150 Patent." ***See*** **Exhibit 7**.

49. SoyLei further alleged it "know[s]" Fresh Roof infringed the '150 Patent "because [Matt Riesselman] admitted that Fresh Roof has purchased sub-epoxidized soybean oil from Colorbiotics," a third-party supplier. *Id.*

50. SoyLei demanded that Fresh Roof cease manufacturing or selling the "Accused Product, as well as any similarly formulated products" and demanded that Fresh Roof not "manufacture, sell or distribute any future products utilizing the inventions claimed in the SoyLei patents." *Id.*

51. Absent Fresh Roof's compliance with SoyLei's demands, SoyLei threatened to "aggressively pursue litigation, including against any distributors of the Accused Products." *Id.*

52. Similarly, SoyLei's March 13 letter to Dr. Hohmann alleged that Dr. Hohmann "worked for Fresh Brands while an Officer of SoyLei," and "improperly used know-how, trade secret confidential information, and SoyLei intellectual property to develop the [Fresh Roof] Accused Products." ***See*** **Exhibit 8**.

53. SoyLei's March 13 letter to Dr. Hohmann included "demonstrative claim charts for the '150 Patent detailing the conduct and admissions that constitute patent infringement." *Id.*

54. The referenced claim chart alleged that Fresh Roof had purchased an emulsion from SoyLei in April 2024. *Id.*

55. The referenced claim chart further alleged that "Fresh Roof previously purchased epoxidized soybean oil from SoyLei," and "Fresh Roof then purchased epoxidized soybean oil from Colorbiotics. Colorbiotics did not (and does not) have a license such that it could sublicense Fresh Roof's use of the epoxidized soybean oil in an emulsion pursuant to the '150 Patent." *Id.*

56. SoyLei demanded that Dr. Hohmann cease manufacturing or selling the "Accused Product, as well as any similarly formulated products" and demanded that Dr. Hohmann not "manufacture, sell or distribute any future products utilizing the inventions claimed in the SoyLei patents." *Id.*

57. Absent Dr. Hohmann's compliance with SoyLei's demands, SoyLei

threatened to "aggressively pursue litigation." *Id.*

58. In SoyLei's March 13 letter to Hawk Seale, SoyLei alleged that "Hawk Seale is selling products, including its HawkSeale product, that directly infringe one or more claims of the '150 Patent (the 'Accused Product')." SoyLei further alleged that it "know[s] this because Mr. Hernandez, who we understand is an agent of Hawk Seale, ordered the SESO product to be delivered to himself at Hawk Seale and has told SoyLei on *multiple occasions* that Hawk Seale is emulsifying and has a surfactant in the HawkSeale product." ***See*** **Exhibit 9**.

59. SoyLei demanded that Hawk Seale cease manufacturing or selling the "Accused Product, as well as any similarly formulated products" and demanded that Hawk Seale not "manufacture, sell or distribute any future products utilizing the inventions claims in the SoyLei patents." *Id.*

60. Absent Hawk Seale's compliance with SoyLei's demands, SoyLei threated "aggressively pursue litigation." *Id.*

61. In SoyLei's March 13 letter to Dr. Hernandez, SoyLei alleged that Dr. Hernandez "had a financial interest in Hawk Seale dating back to 2020," that "the Hawk Seale product improperly incorporates SoyLei's SESO in an emulsified coating product with a surfactant and water in violation of Claim 1 of the '150 Patent," and that SoyLei "knows this because [Dr. Hernandez] ordered the SESO product to be delivered to yourself at Hawk Seale and told SoyLei on multiple occasions that Hawk Seale is emulsifying and has a surfactant in the HawkSeale product." ***See*** **Exhibit 10**.

62. SoyLei attached to this letter another claim chart that purported to

"detail[ ] [Dr. Hernandez's] conduct and admissions that constitute patent infringement."

63. The claim chart includes a March 13, 2025 invoice from SoyLei to Hawk Seale for SESO and emulsion equipment, and a March 10, 2025 estimate of the same invoice from SoyLei to Kermit Miller of Hawk Seale. *Id.*

64. The claim chart also alleges an August 20, 2025 conversation between Dr. Hernandez and Mr. Cochran in which Mr. Cochran purportedly asked Dr. Hernandez, "So you're emulsifying SESO," and Dr. Hernandez answered "We're emulsifying." *Id.*

65. SoyLei demanded that Dr. Hernandez cease manufacturing or selling the "Accused Product, as well as any similarly formulated products" and demanded that Dr. Hernandez not "manufacture, sell or distribute any future products utilizing the inventions claimed in the SoyLei patents." *Id.*

66. Absent Dr. Hernandez's compliance with SoyLei's demands, SoyLei threatened to "aggressively pursue litigation." *Id.*

***Fresh Roof's, Hawk Seale's, Dr. Hohmann's, and Dr. Hernandez's April 13, 2026 Responses***

67. Fresh Roof, Hawk Seale, Dr. Hohmann, and Dr. Hernandez each separately responded by letter dated April 13, 2026 to SoyLei's allegations.

68. In its April 13 response, Fresh Roof explained that the invoice in SoyLei's claim chart for sale of emulsion to Fresh Roof does not demonstrate patent infringement but rather showed that SoyLei had exhausted its patent rights in the sale of the product. ***See*** **Exhibit 11**.

69. Fresh Roof also explained that SoyLei's allegation that Fresh Roof

purchased epoxidized soybean oil from Colorbiotics does not constitute patent infringement by Fresh Roof because at the relevant time period SoyLei had granted Colorbiotics an exclusive license to the ’150 Patent and Colorbiotics warrantied that the products it sold do not infringe any valid U.S. patent. *Id.*

70. Lastly, Fresh Roof explained that the February 21, 2025 email between Mr. Cochran and Dr. Hernandez, ***see*** **Exhibit 1**, showed that SoyLei, through Mr. Cochran, knew and approved of selling epoxidized soybean oil, specifically SESO, and thus demonstrated SoyLei’s alleged claims are equitably estopped. ***See*** **Exhibit 11**.

71. In his April 13 response, Dr. Hohmann explained that he “does not and has never had any financial interest in Fresh Roof nor has he received any financial payment from Fresh Roof in a personal capacity.” ***See*** **Exhibit 12**.

72. Dr. Hohmann further explained that the only conduct by Dr. Hohmann that SoyLei’s March 13 letter refers to is Dr. Hohmann having authored a research paper and performed testing related to rejuvenators. *Id.* Dr. Hohmann explained that SoyLei had not alleged any conduct by Hohmann that could support direct or indirect infringement under 35 U.S.C. § 271. *Id.*

73. In its April 13 response, ***see*** **Exhibit 13,** Hawk Seale cited to the February 21, 2025 email between Mr. Cochran and Dr. Hernandez, ***see*** **Exhibit 1**, and explained that “the sales of SESO product and emulsion equipment from SoyLei to HawkSeale that [SoyLei is] now accusing of infringement were done with the express permission of Eric Cochran as SoyLei board member.” ***See*** **Exhibit 13**. Hawk Seale explained that this constituted an implied license and/or patent exhaustion. *Id.*

74. In his April 13 response, Dr. Hernandez explained that he has never had a financial interest in Hawk Seale and has only acted as an independent contractor for Hawk Seale. ***See*** **Exhibit 14**.

75. Dr. Hernandez further explained that SoyLei's allegation that as a member of SoyLei he sold SESO to Hawk Seale does not support a claim of direct infringement of the '150 Patent. *Id.*

76. Dr. Hernandez also explained that SoyLei's allegations do not support claims of indirect infringement, or such claims are otherwise estopped, because the sale of SESO and emulsion equipment from SoyLei to Hawk Seale was expressly approved by Mr. Cochran as a member of SoyLei. *Id.*

77. Specifically, Dr. Hernandez identified the March 11, 2025 email between him and Mr. Cochran, ***see*** **Exhibit 5**, wherein Mr. Cochran approved the pricing of the March 10, 2025 estimate and March 13, 2025 invoice asserted as the basis of SoyLei's allegations against Dr. Hernandez. ***See*** **Exhibit 14**.

78. In each letter, Fresh Roof, Hawk Seale, Dr. Hohmann, and Dr. Hernandez informed SoyLei that "[i]n light of the explanations provided in this letter, should SoyLei choose to pursue litigation knowing that its patent infringement claims are baseless, [they] will seek all redress due under the law, including attorneys' fees."

79. Plaintiffs note that despite SoyLei's allegations of infringement against Fresh Roof dating back to 2025, at least as late as August 20, 2025, SoyLei itself displayed on its website that FreshRoof was "an exclusive partner of our roofing Product" and displayed the corresponding patent:




***SoyLei's April 27, 2026 Response Continued Alleging Patent Infringement***

80. By response dated April 27, 2026, SoyLei continued to allege that Fresh Roof, Hawk Seale, Dr. Hohmann, and Dr. Hernandez infringed the '150 Patent. ***See* Exhibit 15**.

81. SoyLei asserted that its allegation that Dr. Hohmann infringed the '150 Patent is based "on information and belief that Mr. Hohmann assisted Fresh Brands in their formulation, including because the Fresh Brands websites cite heavily to materials created by Mr. Hohmann during his tenure at Iowa State and SoyLei." *Id.*

82. SoyLei further alleged that Dr. Hernandez and Dr. Hohmann's "conduct, at a minimum, constitutes induced infringement" based on SoyLei's assertion (1) that Dr. Hernandez "frequently acts on HawkSeale's behalf as an agent, including signing leases for HawkSeal"; (2) that "HawkSeale's rent is paid to M&R Properties'

Matthew Riesselmann at Fresh Roof's principal office"; and (3) "SoyLei is aware that SoyLei equipment (including items funded by a USDA grant) made its way without authorization from SoyLei's property to HawkSeale and/or Fresh Brands, presumably at the misguided direction of either Mr. Hernandez or Mr. Hohmann." *Id.*

83. SoyLei disputed that patent exhaustion applies and purported to clarify that its allegation of patent infringement are based on the sale of "SESO, which can be used to make an emulsion that practices SoyLei's patents." *Id.*

84. SoyLei alleged that it "did not authorize the post-sale formulation, processing, modification, or commercial exploitation of the accused products in the manner undertaken by Fresh Brands or HawkSeale, at the direction of Mr. Hernndez and Mr. Hohmann." *Id.*

85. SoyLei also disputed that equitable estoppel applies because it asserted that "Soylei was aware of the sale [of SESO to Hawk Seale]; it was not aware Mr. Hernandez was breaching his duty of loyalty to SoyLei by selling SESO to HawkSeale at the low rate associated with the '265 Patent, while aiding HawkSeale to practice the '150 Patent." *Id.*

86. SoyLei again demanded that Fresh Roof, HawkSeale, Dr. Hohmann, and Dr. Hernandez "immediately cease[ ] infringement," and threatened that "[a]bsent a prompt and meaningful response, SoyLei is prepared to proceed accordingly." *Id.*

***Further Correspondence Showing Non-Infringement***

87. On May 1, 2026, counsel for SoyLei and counsel for Plaintiffs had a call to discuss the issues raised in the March and April letters.

88. On the same day by email, counsel for Plaintiffs (1) confirmed that Fresh Roof implemented a new formulation of its product immediately after SoyLei stopped supplying Fresh Roof; (2) confirmed that the new Fresh Roof formulation does not and has never contained SESO; (3) confirmed that subject to an NDA, Fresh Roof was willing to make the new formulation available to SoyLei and provide a physical product sample for testing by an independent lab.

89. SoyLei did not respond to the May 1 email, and counsel for Plaintiffs followed-up by email on May 6, 2026.

***Hawk Seale and Dr. Hernandez's May 7, 2026 Response***

90. Hawk Seale and Dr. Hernandez responded to SoyLei's April 27 letter collectively by letter dated May 7, 2026. ***See*** **Exhibit 16**.

91. The letter reiterated that Dr. Hernandez "is not and has never been an agent of HawkSeale"; that he "has been an independent contractor for HawkSeale" and as such "he has sourced product and leased space for HawkSeale"; and that "[h]e has no financial interest in HawkSeale." *Id.*

92. The letter also rebutted SoyLei's assertion that SoyLei was unaware of the price the SESO was sold to Hawk Seale or that it was sold to Hawk Seale to be emulsified. *Id.*

93. Specifically, concurrently with the letter, counsel provided a recording of the phone call on February 7, 2025 between Dr. Hernandez and Mr. Cochran, wherein Mr. Cochran asked "How do you want to continue to service Matt and Kermit," referring to Matt Riesselman, Fresh Roof's representative, and Kermit Miller, Hawk

Seale's representative. *Id.*

94. Dr. Hernandez responded, "Well, I told them that they're going to have to do it themselves. So they're going to have to buy the equipment and we're just going to sell the raw materials to them." *Id.*

95. Mr. Cochran approved of that plan on the call, and verified that the equipment that Hernandez had access to would be adequate for their needs. *Id.*

96. The May 7 letter also again referred to the email dated March 11, 2025, ***see*** **Exhibit 5**, wherein Mr. Cochran approved of Dr. Hernandez's pricing of the emulsion equipment and SESO to sell to Hawk Seale, ***see*** **Exhibit 16**.

97. The May 7 letter explained that these facts showing SoyLei's knowledge and approval of the price and sale of SESO and emulsion equipment demonstrates SoyLei granted an implied license to Hawk Seale to practice the '150 Patent and that SoyLei's accusations of induced infringement are unsupported. *Id.*

98. The May 7 letter also informed SoyLei that Hawk Seale "still has in its possession approximately 22,000 lbs of the original 29,430 lbs of SESO product that it purchased from SoyLei," and that "HawkSeale is willing to provide SoyLei with the 22,000 lbs of SESO product for a proportional refund without also reselling the emulsion equipment back to SoyLei." *Id.* The letter further provided that "HawkSeale does not intend to emulsify any further product until this dispute is resolved." *Id.*

99. The May 7 letter reiterated that "[i]n light of the explanations provided in this letter, should SoyLei choose to pursue litigation knowing that its patent infringement claims are baseless, Dr. Hernandez and HawkSeale will seek all redress due under the law,

including attorneys' fees." *Id.*

***SoyLei Continued to Allege Infringement and Misconduct***

100. On May 18, 2026, with no response from SoyLei's counsel, counsel for Plaintiffs emailed SoyLei's counsel to inquire as to SoyLei's position on the status of the matter.

101. Again with no response, counsel for Plaintiffs emailed SoyLei's counsel on May 22, 2026, noting that SoyLei had not withdrawn its allegations of patent infringement despite Plaintiffs providing that (1) with regard to Dr. Hohmann and Fresh Roof, the Fresh Roof products do not contain any SESO and Fresh Roof had offered product formulations and samples to test to demonstrate non-infringement, and (2) with regard to Dr. Hernandez and Hawk Seale, SoyLei had express knowledge of the price and sale of SESO and emulsion equipment to Hawk Seale and Hawk Seale had offered to return the unused SESO for a pro-rated refund. Plaintiffs requested a response by May 27, 2026.

102. On May 28, 2026, SoyLei responded by email through counsel, continuing to allege that Dr. Hernandez and Dr. Hohmann engaged in misconduct by taking materials from SoyLei without authorization, not returning requested materials, and selling product using unauthorized pricing. The email also inquired whether Fresh Roof and Dr. Hohmann's position that they had not infringed is based on whether the emulsion contains SESO, soybean oil ("SO"), or fully epoxidized soybean oil ("FESO"). The email further demanded that Hawk Seale refrain from emulsifying soybean oil ("SO") going forward and that Hawk Seale, Dr. Hernandez, Dr. Hohmann, and Mr. Miller compensate SoyLei for the SESO.

103. On June 3, 2026, Plaintiffs responded through counsel by email, once again confirming that Fresh Roof products do not contain SESO, and confirming that they also do not contain any FESO. The email also again confirmed that only Hawk Seale had used SESO in emulsions for asphalt, and the sale, price, and use of the SESO and emulsion equipment was expressly approved by SoyLei.

104. In a June 9, 2026 email, counsel for SoyLei for the first time asserted that Fresh Roof's marketing materials suggest that Fresh Roof is using SESO and SoyLei's patented technology, and that it would be misconduct if Hawk Seale were using the emulsion equipment to make Fresh Roof product.

105. Counsel for SoyLei and counsel for Plaintiffs discussed the dispute on June 16, 2026, and counsel for Plaintiffs followed-up by email on June 17, 2026 to confirm (1) that Dr. Hohmann and Dr. Hernandez were willing to engage with the process of withdrawing from SoyLei, (2) that Fresh Roof was willing to sell product to SoyLei for testing, and (3) whether SoyLei continued to have objections to any pictures on Fresh Roof's website.

***SoyLei Escalated the Dispute by filing a Baseless Criminal Complaint***

106. On or around June 17, 2026, Plaintiffs learned that SoyLei had filed a police report in Ames, Iowa that alleged that Dr. Hernandez and Dr. Hohmann stole property from SoyLei.

107. On June 22, 2026, Plaintiffs provided to the Ames police officer investigating the allegation conclusive evidence demonstrating that the allegations that Drs. Hernandez and Hohmann "stole" material from SoyLei were false. This evidence

included (1) the same audio recording of the conversation between Dr. Hernandez and Mr. Cochran wherein Mr. Cochran approved of the sale of emulsion equipment and SESO raw material to Hawk Seale and/or Fresh Roof; (2) email chains between Dr. Hernandez and Mr. Cochran in which Mr. Cochran approved the sale and price of the disputed items; (3) the invoice that SoyLei issued—and that SoyLei included in its initial March 13, 2026 letters accusing Dr. Hernandez and Hawk Seale of patent infringement—in connection with the disputed sale; (4) records of payment from Hawk Seale to SoyLei related to the invoice; and (5) the March 13, 2026 letter from SoyLei to Dr. Hernandez.

108. On June 23, 2026, the police officer confirmed that he was closing the case and stated the matter appears to be a civil issue. ***See* Exhibit 17.**

109. Accusing Dr. Hernandez and Dr. Hohmann of stealing material was false and defamatory.

***Further Communications and Allegations from SoyLei***

110. On June 18, 2026, SoyLei responded that Fresh Roof's dealers continue to promote Fresh Roof products as having GreenSoy patented technologies developed at Iowa State. SoyLei further objected to an image on Fresh Roof's website that depicted chemistry and mechanics of SESO's interaction with asphalt, asserting this is misleading when Fresh Roof's product does not contain SESO. SoyLei again requested that Fresh Roof provide a product sample for testing.

111. On June 23, 2026, Plaintiffs continued to agree to providing a Fresh Roof product sample for testing, but in light of SoyLei's escalation through it filing a police report, Fresh Roof required that the sample be sent directly to an independent laboratory to

ensure chain-of-custody.

112. Fresh Roof further explained that it has already sent a communication to its dealers in March 2026 advising dealers to remove references to the prior products with SESO. Fresh Roof explained it does not control the independent websites or parties who operate them, but it has used its best efforts to remove all references to the old product formulation.

113. Fresh Roof further explained that the purported SESO chemistry image that SoyLei objected to was modified several months prior to remove any reference to SESO chemistry. Fresh Roof also explained that that the other image SoyLei objected to which depicts testing equipment that may be owned by Iowa State, is not owned by SoyLei and does not provide a basis for any allegation of misconduct.

114. Despite Fresh Roof's product being publicly available for purchase and testing at all times, it was not until June 26, 2026 by email that SoyLei stated it had independently obtained Fresh Roof materials to sample. SoyLei also continued to allege that Fresh Roof's marketing materials reference SoyLei, its products, and data, and that this demonstrates misconduct by Dr. Hohmann, Dr. Hernandez, and Mr. Riesselman.

***SoyLei Continued to Escalate the Dispute through Disparaging and Defamatory Statements about Fresh Roof and Filing a Baseless Complaint with the Iowa Attorney General***

115. Fresh Roof lists its dealers on its website.

116. On or around July 6, 2026, Fresh Roof learned that SoyLei, through Mr. Cochran, made statements to a Fresh Roof dealer that the product that Fresh Roof is selling "isn't exactly as advertised."

117. On or around July 8, 2026, Fresh Roof learned from some of its current dealers that Mr. Cochran had told the dealers that SoyLei "owns GreenSoy technologies" and that Fresh Roof "stole it from" SoyLei, that SoyLei is suing Fresh Roof, and that Fresh Roof's product "does not work."

118. On July 9, 2026, Fresh Roof sent a cease and desist letter to SoyLei regarding these statements and demanding, among other things, that SoyLei cease the conduct and confirm by July 13, 2026 that it has complied with Fresh Roof's demands. ***See* Exhibit 18**.

119. SoyLei did not substantively respond to Fresh Roof's cease and desist letter.

120. As a result of SoyLei's statements to and interference with Fresh Roof's dealers, one of Fresh Roof's dealers demanded a refund for the product the dealer bought from Fresh Roof and no longer works with Fresh Roof. Fresh Roof paid for the original shipping of the product, the refund, and the return shipping.

121. Mr. Riesselman called the dealer about the refund demand and learned that SoyLei had told the dealer that everything Fresh Roof said about its product is a lie, that Fresh Roof is using SoyLei's technology without permission or giving credit, that Fresh Roof's product doesn't work, and that Fresh Roof's product testing is fake.

122. After hearing this from SoyLei, the dealer did not want to be involved with Fresh Roof.

123. Since SoyLei began contacting and interfering with Fresh Roof's dealers, at least one other dealer has stopped ordering product from Fresh Roof, and Fresh

Roof's sales numbers have dropped approximately 30 to 40 percent.

124. To date, SoyLei has not responded to Fresh Roof's cease and desist letter. Instead, on July 14, 2026, Fresh Roof received correspondence from the Iowa Attorney General's Office that Mr. Cochran had filed a consumer complaint on behalf of SoyLei against Fresh Roof, making allegations based on third-party references to SoyLei product and a screenshot of Fresh Roof's Google advertising mentioning a SoyLei product. ***See* Exhibit 19.**

125. Fresh Roof responded to the Iowa Attorney General's Office on July 21, 2026, explaining that Mr. Cochran's complaint was an improper use of the consumer complaint statute. ***See* Exhibit 20.** Fresh Roof pointed out that the third-party references were not misleading because the third-party was a dealer that still had product that it had previously ordered from SoyLei through Fresh Roof; even so, Fresh Roof had asked the third-party to remove the objected-to language; and Fresh Roof had already removed references to SoyLei from its website and had removed SoyLei's product from its keyword advertising weeks prior.

126. In further escalation, on July 16, 2026, SoyLei filed an action against Plaintiffs in Iowa state district court, Case No. LACV055166, bringing claims of conversion, breach of fiduciary duty, judicial expulsion, and unfair competition. ***See* Exhibit 21.**

127. Despite repeated evidence to the contrary, SoyLei's Iowa state court action alleges that Fresh Roof sells or markets products that "are or were based on or derived from SoyLei's SESO emulsion technology, formulations, and testing data," and

that Fresh Roof's product "may still include SESO, a polymer, and asphalt emulsion, and is substantially similar to SoyLei's asphalt-related technologies." *Id.*

128. SoyLei and Hawk Seale also never reached a resolution regarding SoyLei's allegations of patent infringement or Hawk Seale's request for a refund regarding the remaining 22,000 lbs of SESO product in Hawk Seale's possession.

***SoyLei's Copyright Infringement***

129. In addition to all of the improper conduct described herein, SoyLei has misappropriated and infringed Fresh Roof's advertising materials.

130. At least as early as August 26, 2026, SoyLei has been displaying the following image of an individual spraying product on a roof (the "Accused Photograph") on its website at https://soylei.com/products to advertise its APEX-1132 product:



131. This image – which Fresh Roof believes was generated using AI – is substantially similar to a photograph (the "Subject Photograph", ***see*** **Exhibit 22**) that Fresh Roof uses to advertise and sell its products:




132. The Subject Photograph was taken in 2020 by Emily Belgrade and depicts Mr. Riesselman on the roof of his home at the time.

133. The Subject Photograph is registered with the U.S. Copyright Office as Reg. No. VA 2-521-821. ***See*** **Exhibit 23.**

134. Ms. Belgrade assigned ownership of all rights to the copyright of the Subject Photograph to Fresh Roof.

135. Fresh Roof displayed the Subject Photograph on its website as early as October 2020 and has displayed it on its social media pages.

136. SoyLei deliberately and intentionally made a substantial copy of the Subject Photograph and used and displayed that on its website.

**COUNT ONE**
**(Declaratory Judgment of Non-Infringement)**
**By Fresh Roof, Hawk Seale, Dr. Hohmann, and Dr. Hernandez**

137. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

138. As a result of the acts described in the preceding paragraphs, there is an actual controversy within the jurisdiction of this Court under 28 U.S.C. §§ 2201 and 2202, and the controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment of non-infringement.

139. A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain Fresh Roof's rights regarding its roof rejuvenation product and the '150 Patent, including Fresh Roof's right to freely sell such product without ongoing threats from Defendant.

140. A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain Hawk Seale's rights regarding its asphalt product, the remaining 22,000 lbs of SESO, and the '150 Patent, including Hawk Seale's right to freely sell such product without ongoing threats from Defendant.

141. Plaintiffs are entitled to a declaratory judgment that Fresh Roof's roof rejuvenation product, Hawk Seale's asphalt product, and Plaintiffs' conduct has not

infringed and is not infringing, either directly or indirectly, any valid claim of the ’150 Patent under 35 U.S.C. § 271.

**COUNT TWO**
**(Unfair Competition Under 15 U.S.C. § 1125(a))**
**By Fresh Roof**

142. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

143. Defendant made false or misleading statements of fact in commercial advertising or promotion, including at least stating to Fresh Roof’s customers that Plaintiffs “stole” SoyLei’s technology.

144. The false or misleading statements actually deceived or are likely to deceive a substantial segment of the intended audience.

145. The false or misleading statements are material and likely to influence the customer’s purchasing decision.

146. Defendant’s statements constitute misleading descriptions and representation of fact.

147. Upon information and belief, Defendant’s conduct as alleged herein is willful and is intended to and is likely to cause injury to Fresh Roof.

148. Defendant’s conduct as alleged herein constitutes unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

149. Defendant’s conduct as alleged herein is causing harm and injury to Fresh Roof, and to its goodwill and reputation, and will continue to both damage Fresh Roof and confuse the public.

150. Fresh Roof is entitled to, among other relief, an award of actual damages, Defendant's profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

**COUNT THREE**
**(Defamation)**
**By Fresh Roof**

151. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

152. On or about July 8, 2026, SoyLei through Mr. Cochran falsely told customers of Fresh Roof that Fresh Roof "stole" SoyLei's technology and that Fresh Roof's products "do not work."

153. SoyLei's statements were of and concerning Fresh Roof and making the statements to third-parties constitutes publication.

154. Defendant's statements conveyed the false and defamatory meaning and implication that Fresh Roof has engaged in theft of intellectual property and that its products are defective or poorly designed.

155. These statements were false when made and Defendant either knew they were false, acted with reckless disregard for the truth, or negligently published them without verifying their accuracy.

156. Defendant's publication of these false statements has caused and continues to cause harm to Fresh Roof's reputation, including lost sales, damage to goodwill, and diminished standing in the marketplace.

**COUNT FOUR**
**(Defamation)**
**By Dr. Hernandez and Dr. Hohmann**

157. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

158. On or about July 8, 2026, SoyLei made a police report to an Ames police officer and told the officer that Dr. Hernandez and Dr. Hohmann had stolen property from SoyLei.

159. Defendant's statement was of and concerning Dr. Hernandez and Dr. Hohmann and making the statement to third parties constitutes publication.

160. Defendant's statement conveyed the false and defamatory meaning and implication that Dr. Hernandez and Dr. Hohmann had engaged in theft of Defendant's property.

161. Defendant's statement is an accusation of an indictable crime of moral turpitude and is therefore defamatory per se.

162. This statement was false when made and made without good faith. Defendant either knew the statement was false, acted with reckless disregard for the truth, or negligently published the statement without verifying their accuracy.

163. Defendant's publication of the false statements has caused and continues to cause harm to Dr. Hernandez's and Dr. Hohmann's reputations, including lost sales, damage to goodwill, and diminished standing in the marketplace.

**COUNT FIVE**
**(Copyright Infringement 17 U.S.C. § 501)**
**By Fresh Roof**

164. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

165. The Subject Photograph is an original visual work containing copyrightable subject matter for which copyright protection exists under the Copyright Act, 17 U.S.C. § 101, et. seq.

166. The Subject Photograph is registered with the U.S. Copyright Office as Reg. No. VA 2-521-821.

167. Fresh Roof owns a valid copyright in the Subject Photograph as an original creative work.

168. On information and belief, SoyLei had access to the Subject Photograph, including, without limitation, through viewing the Subject Photograph on the Internet.

169. SoyLei used and displayed a version of the Subject Photograph that is substantially the same on SoyLei's website at https://soylei.com/products.

170. The Accused Photograph copies the constituent elements of the Subject Photograph that are original, including the same elements, composition, colors, arrangement, subject, lighting, angle, and overall appearance of the Subject Photograph, all of which constitutes unauthorized use of the Subject Photograph.

171. SoyLei used, including making a derivative work, published, and displayed the Accused Photograph to the public without Fresh Roof's authorization or consent.

172. Due to SoyLei's act of infringement, Fresh Roof has suffered general and special damages in an amount to be established at trial.

173. On information and belief, SoyLei has committed acts of copyright infringement as alleged in the preceding paragraphs that were willful, intentional, and malicious.

**COUNT SIX**
**(Intentional Interference With Business or Contractual Relations)**
**By Fresh Roof**

174. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

175. Fresh Roof has existing business and contractual relationships with its dealers regarding purchasing Fresh Roof's products.

176. Fresh Roof's dealers are identified and publicly available on Fresh Roof's website.

177. SoyLei has knowledge of what dealers work with Fresh Roof.

178. SoyLei intentionally and improperly interfered with Fresh Roof's business and contractual relationships with its dealers by contacting Fresh Roof's dealers and making defamatory and disparaging statements.

179. SoyLei's interference caused Fresh Roof's dealers to not perform or otherwise made performance more burdensome or expensive, including losing

relationships with dealers who no longer sell Fresh Roof's products and paying to refund dealers and paying for return shipping of product.

180. SoyLei's interference was improper and done with the predominant purpose of financially harming or destroying Fresh Roof's business.

181. SoyLei's interference has caused damage to Fresh Roof, including dealers no longer selling Fresh Roof's product, the cost of refunding and return shipping product, and lost sales of approximately 30 to 40 percent.

182. SoyLei interfered with legal malice because its actions constitute a willful, wanton, and reckless disregard for Fresh Roof's rights and they were specifically directed against Fresh Roof.

183. Fresh Roof is entitled to damages, including compensatory and punitive damages.

**COUNT SEVEN**
**(Declaratory Judgment of No Conversion)**
**By Dr. Hernandez and Dr. Hohmann**

184. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

185. As a result of the state court action that SoyLei filed, including a claim for conversion against Dr. Hernandez and Dr. Hohmann, and the other acts described in the preceding paragraphs, there is an actual controversy within the jurisdiction of this Court under 28 U.S.C. §§ 2201 and 2202, and the controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment of no conversion.

186. A judicial declaration is necessary and appropriate and will serve a useful purpose in clarifying the legal relations between the parties and will terminate the uncertainty giving rise to this proceeding.

187. Dr. Hernandez and Dr. Hohmann are entitled to a declaratory judgment that they are not liable to SoyLei for conversion.

**COUNT EIGHT**
**(Declaratory Judgment of No Breach of Fiduciary Duty)**
**By Dr. Hernandez and Dr. Hohmann**

188. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

189. As a result of the state court action that SoyLei filed, including a claim for breach of fiduciary duty against Dr. Hernandez and Dr. Hohmann, and the other acts described in the preceding paragraphs, there is an actual controversy within the jurisdiction of this Court under 28 U.S.C. §§ 2201 and 2202, and the controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment that Dr. Hernandez and Dr. Hohmann have not breached any fiduciary duty to SoyLei.

190. A judicial declaration is necessary and appropriate and will serve a useful purpose in clarifying the legal relations between the parties and will terminate the uncertainty giving rise to this proceeding.

191. Dr. Hernandez and Dr. Hohmann are entitled to a declaratory judgment that they have not breached a fiduciary duty to SoyLei.

**COUNT NINE**
**(Declaratory Judgment Against Judicial Expulsion)**
**By MAAD and Herlan**

192. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

193. As a result of the state court action that SoyLei filed, including a claim for judicial expulsion of MAAD and Herlan from SoyLei, and the other acts described in the preceding paragraphs, there is an actual controversy within the jurisdiction of this Court under 28 U.S.C. §§ 2201 and 2202, and the controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment against judicial expulsion.

194. A judicial declaration is necessary and appropriate and will serve a useful purpose in clarifying the legal relations between the parties and will terminate the uncertainty giving rise to this proceeding.

195. MAAD and Herlan are entitled to a declaratory judgment that their judicial expulsion from SoyLei is not warranted.

**COUNT TEN**
**(Declaratory Judgment of No Unfair Competition)**
**By Fresh Roof, Hawk Seale, Herlan, and MAAD**

196. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

197. As a result of the state court action that SoyLei filed, including a claim for unfair competition against Fresh Roof, Hawk Seale, Herlan, and MAAD, and the other acts described in the preceding paragraphs, there is an actual controversy within the jurisdiction of this Court under 28 U.S.C. §§ 2201 and 2202, and the controversy is of

sufficient immediacy and reality to warrant the issuance of a declaratory judgment of no unfair competition.

198. A judicial declaration is necessary and appropriate and will serve a useful purpose in clarifying the legal relations between the parties and will terminate the uncertainty giving rise to this proceeding.

199. Fresh Roof, Hawk Seale, Herlan, and MAAD are entitled to a declaratory judgment that they are not liable to SoyLei for unfair competition.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request judgment against Defendant as follows:

1. Declaring that Plaintiffs have not infringed, directly or indirectly, any valid claim of the ’150 Patent in violation of 35 U.S.C. § 271;
2. Declaring that Hawk Seale is free to emulsify the 22,000 lbs of SESO that it purchased from SoyLei and sell the emulsified product;
3. Declaring Plaintiffs as the prevailing party and this case as exceptional, and awarding Plaintiffs their reasonable attorneys’ fees, pursuant to 35 U.S.C. § 285;
4. Adjudging Defendant’s conduct as unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a);
5. Directing that Defendant account to and pay over to Fresh Roof all of Defendant’s profits realized by its wrongful acts in accordance with Section 35(a) of the Lanham Act (15 U.S.C. § 1117(a)), enhanced as appropriate to compensate Fresh Roof for the damages caused thereby;

6. Adjudging SoyLei defamed Fresh Roof;

7. Adjudging SoyLei defamed Dr. Hernandez and Dr. Hohmann;

8. Adjudging that SoyLei infringed Fresh Roof's copyright in the Subject Photograph;

9. Adjudging that SoyLei intentionally interfered with Fresh Roof's contractual relationships;

10. Awarding Fresh Roof exemplary damages as the court finds appropriate to deter any future willful infringement;

11. Declaring that this is an exceptional case pursuant to Section 35(a) of the Lanham Act and awarding Fresh Roof its costs and reasonable attorneys' fees thereunder (15 U.S.C. § 1117(a));

12. Declaring that Dr. Hernandez and Dr. Hohmann are not liable to SoyLei for conversion;

13. Declaring that Dr. Hernandez and Dr. Hohmann are not liable to SoyLei for breach of fiduciary duty;

14. Declaring that judicial expulsion of MAAD and Herlan from SoyLei is not warranted;

15. Declaring that Plaintiffs did not engage in unfair competition in violation of Iowa common law;

16. Ordering Defendant to pay Plaintiffs' fees, expenses, and costs associated with this action; and

17. Awarding such other and further relief as the Court deems just and proper.

Dated: September 21, 2026

Respectfully submitted,

TAFT STETTINIUS & HOLLISTER, LLP

*/s/ Peter E. Deegan*
Peter Deegan (No. 29188)
Sanjay K. Murthy (*pro hac vice* forthcoming, No. 6279314)
111 East Wacker Drive, Suite 2600
Chicago, IL 60601-4208
(312) 527-4000
PDeegan@taftlaw.com
SMurthy@taftlaw.com

Samantha Picans (*pro hac vice* forthcoming, CO Bar No. 44852)
675 15th St., Suite 2300
Denver, CO 80202
(303) 299-8008
SPicans@taftlaw.com

Hannah S. Fereshtehkhou
(*pro hac vice* forthcoming, MN Bar No. 0404002)
80 South Eighth Street
2200 IDS Center
Minneapolis, MN 55402
(612) 977-8400
hfereshtehkhou@taftlaw.com

**ATTORNEYS FOR PLAINTIFFS**

303232414